**WHATLEY KALLAS, LLP**
Alan M. Mansfield (State Bar No. 125998)
355 So. Grand Avenue
Suite 2450
Los Angeles, CA 90071

16870 W. Bernardo Drive, Suite 400
San Diego, CA 92127
Phone: (310) 684-2504
      (858) 674-6641
Fax:   (855) 274-1888
Email: amansfield@whatleykallas.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Yeremey O. Krivoshey (State Bar No. 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
      ykrivoshey@bursor.com

*Attorneys for Plaintiffs*

*[Additional Counsel Appear on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAUREN SLAUGHTER, etc.,<br><br>     Plaintiffs,<br>v.<br><br>VIRGIN SCENT, INC., D/B/A ARTNATURALS, and DOES 1-10<br><br>     Defendants.<br>_____<br>KAILA SAIKI and RAYMOND SAIKI, etc.,<br><br>     Plaintiffs,<br>v.<br><br>VIRGIN SCENT, INC., D/B/A ARTNATURALS, INC.<br><br>Defendant. | Consolidated Case No. 2:21-CV-02875-VAP-E<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 2:21-CV-02948-VAP-E

Plaintiffs Lauren Slaughter, Kaila Saiki, Raymond Saiki, Stephanie Pinghera, Jody McIntyre, Mayra Duarte, Lucas Pichardo, Amy Robinson, Donald Boorman, Kenneth Scantlin, Shelley Howe, and Mark Sophocles ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the following on the investigation of their counsel and upon information and belief, which factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery, except as to Plaintiffs' allegations regarding their own actions, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant Virgin Scent, Inc. d/b/a Artnaturals, Inc.'s ("Artnaturals" or "Defendant") manufacture, distribution, and sale of hand sanitizer that contains dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      Since the outbreak of COVID-19, hand sanitizers have become a hot commodity.  A *Wall Street Journal* article reported that sales of hand sanitizer in the United States jumped 600% in 2020 to $1.3 billion, compared to a year earlier.[1] One of the beneficiaries of this boost in hand sanitizer sales was Defendant. Defendant sells a particular model of hand sanitizer labeled as "artnaturals hand sanitizer SCENT FREE NATURAL ELEMENTS + CLEANSING FORMULA 8 fl oz (236 ml)" (the "Hand Sanitizer" or the "Product").

3.      The Hand Sanitizer is a gel hand sanitizer, as compared to liquid or foam hand sanitizers.

4.      Defendant's Hand Sanitizer contains benzene, a carcinogenic chemical impurity that has been linked to leukemia and other cancers.  The Product is not

---

[1] Sharon Terlep, *Hand Sanitizer Sales Jumped 600% in 2020. Purell Maker Bets Against a Post-Pandemic Collapse*, THE WALL STREET J., Jan. 22, 2021, https://www.wsj.com/articles/hand-sanitizer-sales-jumped-600-in-2020-purell-maker-bets-against-a-post-pandemic-collapse-11611311430.

designed to contain benzene, and in fact no amount of benzene is acceptable in gel hand sanitizer products such as the ones manufactured by Defendant.  The presence of benzene in the Hand Sanitizer renders the product unsafe and worthless.  Further, the presence of benzene in the Hand Sanitizer renders it adulterated and misbranded.  As a result, the Hand Sanitizer is illegal to sell under federal and state law and therefore worthless.

5.    Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists Benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  The World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound, defining it as "carcinogenic to humans."[2]  In 2011, the United States Environmental Protection Agency introduced regulations that lowered limits on benzene in gasoline due to its carcinogenic nature.[3]  California's Proposition 65 Fact Sheet for benzene states, "[b]enzene is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm. Exposure to benzene can cause leukemia. Exposure to benzene during pregnancy may affect development of the child. It may also harm the male reproductive system."[4]

6.    According to the American Cancer Society:

IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic

_____

[2] https://monographs.iarc.who.int/list-of-classifications
[3] https://www.epa.gov/gasoline-standards/gasoline-mobile-source-air-toxics
[4] https://www.p65warnings.ca.gov/fact-sheets/benzene

leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[5]

7.    According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact." (emphasis added).  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.[6]

8.    On March 24, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene and other contaminants in specific batches of hand sanitizer products containing active pharmaceutical ingredients of ethanol and isopropanol."[7]

9.    Valisure tested the Hand Sanitizer manufactured by Defendant, which was found to contain between 15.2 to 16.1 parts per million of benzene[8]:

| Benzene Mean (ppm +/- %SD) | Brand and Label Description | Type | Product Code(s) | Manufacturing/Distributing Label Text |
|---|---|---|---|---|
| 16.1 +/- 3% | artnaturals hand sanitizer SCENT FREE NATURAL | Gel | UPC: 816820028205 NDC: 74642-000 | DIST. BY artnaturals ® Gardena, CA 90248  MADE IN CHINA |

---

[5] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[6] VALISURE, VALISURE CITIZEN PETITION ON HAND SANITIZER PRODUCTS CONTAINING BENZENE CONTAMINATION AND OTHER SIGNIFICANT ISSUES, Mar. 24, 2021, https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Hand-Sanitizer-v4.14.pdf (the "Valisure Petition"), at 2.

[7] *Id.* at 1.

[8] *Id.* at 14.

| | ELEMENTS + CLEANSING FORMULA 8 fl oz (236 ml) | | | |
|---|---|---|---|---|
| 15.2 +/- 3% | artnaturals hand sanitizer SCENT FREE NATURAL ELEMENTS + CLEANSING FORMULA 8 fl oz (236 ml) | Gel | UPC: 816820028205 NDC: 74642-000 | DIST. BY artnaturals ® Gardena, CA 90248 MADE IN CHINA |

10.    Defendant's Hand Sanitizer has the highest levels of benzene of all of the hand sanitizer products tested by Valisure.

11.    The levels of benzene in the Hand Sanitizer are **eight times** the permissible level of benzene[9] for liquid hand sanitizers (which is 2 parts per million). However, because the Hand Sanitizer is a gel product, there is **no permissible level** for benzene because benzene is not required for the manufacture of gel hand sanitizers.

12.    The FDA generally regulates hand sanitizer products as over-the-counter ("OTC") drug products. Accordingly, such products are subject to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), and to FDA regulations and guidance, as well as analogous state statutes and regulations. Defendant's packaging, labeling, distribution, marketing, and sale of its hand sanitizer products is

---

[9] In order to compensate for the increased demand for hand sanitizers due to the pandemic, the FDA announced on June 1, 2020 that it would set a temporary interim limit of benzene of 2 ppm for liquid (not gel or foam) hand sanitizers.  While Defendant's Product, a gel product, does not receive the benefit of the interim limit, it nevertheless far exceeds the permissible interim limits of benzene for liquid products.

also subject to California's Sherman Food, Drug & Cosmetic Law, California Health & Safety Code §109875 *et seq.* ("Sherman Law"), which adopts, incorporates, and is identical in the respects relevant here to the federal FDCA.

13.     Defendant does not disclose the actual or potential presence of benzene in its hand sanitizer products at all on the Product's labeling, or in any advertising or website promoting the Product.  Nor does Defendant disclose anywhere else the actual or potential presence of benzene in its hand sanitizer products. The presence of benzene renders the Product both adulterated and misbranded under the FDCA and the Sherman Law.  The Product is adulterated because "it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C. § 351(a)(1); Cal. Health & Safety Code § 111260.  Specifically, in issuing guidance to the industry, the FDA indicated that "[i]f a firm wishes to use or supply a fuel or technical grade ethanol that does not meet USP or FCC requirements, the firm should test the ethanol (or have a third party laboratory conduct testing) to identify the levels of impurities listed in the USP monograph as well as any other potentially harmful impurities that may be present given the manufacturing environment."[10]  Defendant clearly failed to perform this required testing.  The Product is misbranded because its labeling is "false" and "misleading" because it does not disclose the presence of benzene.  21 U.S.C. § 352(a)(1); Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular.").

---

[10] TEMPORARY POLICY FOR PREPARATION OF CERTAIN ALCOHOL-BASED HAND SANITIZER PRODUCTS DURING THE PUBLIC HEALTH EMERGENCY (COVID-19) GUIDANCE FOR INDUSTRY (Feb. 10, 2021), at 11, https://www.fda.gov/media/136289/download

14.     Under both federal and California law, a product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, held, or sold. Adulterated and misbranded products thus have no economic value and are legally worthless. That the Product is both adulterated and misbranded, standing alone, constitutes an "unlawful" business practice and renders Defendant strictly liable to Plaintiffs and members of the Class, and public injunctive relief appropriate for the benefit of the general public. Purchasers of adulterated and/or misbranded products such as Defendant's Hand Sanitizer are thus entitled to a full refund of their purchase price.

15.     Ironically, Defendant has previously touted its safety record.  In December 2020, when other hand sanitizers were being inspected or recalled due to efficacy and safety concerns, Defendant put out the following statement:

> Due to the global demand for sanitizing and personal protective products, hand sanitizer sales have grown at an unprecedented and exponential rate. With this demand, poorly formulated hand sanitizers made their way into the market, causing a massive recall of certain brands of hand sanitizer.

> Earlier this year the FDA warned that certain hand sanitizers may not be able to properly clean and sanitize hands, due to insufficient levels of ethyl alcohol and isopropyl alcohol. On top of that, the agency has announced that certain hand sanitizers have tested positive for methanol, a type of alcohol that can be toxic when applied to your hands, and dangerous when ingested.

> The FDA released a list of 149 sanitizers that they deemed unsafe to use. **One name you will not find that list is artnaturals! Your safety is our number one priority and we are committed to providing you with top of the line high-quality ingredients to keep you and your family safe.**

> …

> Always be cautious of what is going into the products that you and your family use everyday, and **know you can trust artnaturals**

**with any and all of your sanitizing needs!**[11]

16.     Plaintiffs and the Class were injured in fact and lost money or property in terms of the full purchase price of the Hand Sanitizer.  The Hand Sanitizer is worthless, as it contains harmful levels of benzene.  As the Hand Sanitizer exposes consumers to benzene well above any permissible limit (which in this case is zero), the Hand Sanitizer is not fit for ordinary reasonably foreseeable use by humans. Defendant's Hand Sanitizer was unmerchantable because it contained dangerous levels of benzene, and was therefore adulterated, misbranded, and illegal to sell in the United States.

17.     Plaintiffs and Class members did not know, and had no reason to know, that Defendant's hand sanitizer products were adulterated and misbranded. Plaintiffs would not have purchased Defendant's hand sanitizer products at all but for Defendant's material misrepresentations and omissions, or if they had been told of the actual or potential presence of benzene in these hand sanitizer products and/or that it was not legal to receive or sell such products under state law. Plaintiffs and members of the Class who purchased Defendant's hand sanitizer products were overcharged for these products, which by law were worthless. Plaintiffs and Class members reviewed the labels, advertising, and/or marketing of Defendant's hand sanitizer products, reasonably acted in positive response to those representations and omitted material facts and were thereby deceived.

18.     Plaintiffs bring this action on behalf of themselves and the Class for equitable relief and to recover damages and restitution for:  (i) breach of express warranty, (ii) breach of implied warranty, (iii) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, (iv) violation of New York General Business Law § 349, (v) violation of New York General

---

[11] HAND SANITIZER RECALL, AND WHAT YOU SHOULD KNOW (Dec. 28, 2020), https://artnaturals.com/blog/hand-sanitizer-recall-and-what-you-should-know.html (emphasis added).

CONSOLIDATED CLASS ACTION COMPLAINT                                    7
CASE NO. 2:21-CV-02948-VAP-E

Business Law § 350, (vi) unjust enrichment, (vii) fraud, (viii) violation of California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), (ix) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), (x) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, (xi) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), (xii) violation of the Texas Deceptive Trade Practices Act ("DTPA"); (xiii) violation of the Washington Consumer Protection Act, (xiv) violation of the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.*, (xv) violation of the Oregon Unlawful Trade Practices Act, O.R.S. § 646.605, *et seq.* and (xvi) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq.*, as well as any other applicable state consumer protection laws.

## PARTIES

19.     On personal knowledge, Plaintiff Lauren Slaughter is a natural person and a resident of Alabama. During the past year, Plaintiff purchased Defendant's hand sanitizer products, and specifically purchased Defendant's ArtNaturals-branded hand sanitizer products at a grocery store in Birmingham, Alabama, in approximately October 2020, primarily for personal, family, and household use. Prior to purchasing this product, Plaintiff reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

20.     On personal knowledge, Plaintiff Kaila Saiki is a resident of Cook County, Illinois and has an intent to remain there, and is therefore a domiciliary of Illinois.  On or about May 23, 2020, Ms. Saiki purchased a bottle of the Hand Sanitizer with her husband from a Target in Illinois for personal use.  Ms. Saiki and her husband paid approximately $4 for the bottle.  When purchasing the Hand

Sanitizer, Ms. Saiki reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Hand Sanitizer was properly manufactured, free from defects, and safe for its intended use. Ms. Saiki relied on these representations and warranties in deciding to purchase the Hand Sanitizer manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Hand Sanitizer from Defendant if she had known that it was not, in fact, properly manufactured and free from defects. Had Defendant made Plaintiff Kaila Saiki aware of the fact that the Product contained the harmful impurity benzene, she would not have purchased the Product.

21.     On personal knowledge, Plaintiff Raymond Saiki is a resident of Cook County, Illinois and has an intent to remain there, and is therefore a domiciliary of Illinois. On or about May 23, 2020, Mr. Saiki purchased a bottle of the Hand Sanitizer with his wife from a Target in Illinois for personal use. Mr. Saiki and his wife paid approximately $4 for the bottle. When purchasing the Hand Sanitizer, Mr. Saiki reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Hand Sanitizer was properly manufactured, free from defects, and safe for its intended use. Mr. Saiki relied on these representations and warranties in deciding to purchase the Hand Sanitizer manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that he would not have purchased the Hand Sanitizer from Defendant if he had known that it was not, in fact, properly manufactured and free from defects. Had Defendant made Plaintiff Raymond Saiki aware of the fact that the Product contained the harmful impurity benzene, he would not have purchased the Product.

22.     On personal knowledge, Plaintiff Stephanie Pinghera is a resident of Bronx County, New York and has an intent to remain there, and is therefore a

domiciliary of New York.  In or around December 2020, Ms. Pinghera purchased a bottle of the Hand Sanitizer from a Walmart in New York for personal use.  Ms. Pinghera paid approximately $4 for the bottle.  When purchasing the Hand Sanitizer, Ms. Pinghera reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer that the Hand Sanitizer was properly manufactured, free from defects, and safe for its intended use.  Ms. Pinghera relied on these representations and warranties in deciding to purchase the Hand Sanitizer manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Hand Sanitizer from Defendant if she had known that it was not, in fact, properly manufactured and free from defects.  Had Defendant made Plaintiff Stephanie Pinghera aware of the fact that the Product contained the harmful impurity benzene, she would not have purchased the Product.

23.    On personal knowledge, Plaintiff Jody McIntyre is a natural person and a resident of Minnesota. Plaintiff Jody McIntyre purchased two bottles of Defendant's ArtNaturals-branded hand sanitizer products in May of 2020 from a Target store in Richfield, Minnesota, for personal, family, and household use. Prior to purchasing these products, Plaintiff Jody McIntyre reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Jody McIntyre would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

24.    On personal knowledge, Plaintiff Mayra Duarte is a natural person and a resident of California. Plaintiff Mayra Duarte purchased four bottles of Defendant's ArtNaturals-branded hand sanitizer products in April of 2020 from a Wal-Mart store in Glendora, California. Prior to purchasing these products, Plaintiff Mayra Duarte reviewed the product label, which contained no disclosure of the actual or potential

presence of benzene. Plaintiff Mayra Duarte would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

25.    On personal knowledge, Plaintiff Lucas Pichardo is a natural person and a resident of Florida. Plaintiff Lucas Pichardo purchased Defendant's ArtNaturals-branded hand sanitizer products in the spring of 2020 from a Wal-Mart store in Miami-Dade County, Florida, for personal, family, and household use. Prior to purchasing these products, Plaintiff Lucas Pichardo reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Lucas Pichardo would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

26.    On personal knowledge, Plaintiff Amy Robinson is a natural person and a resident of Texas. Plaintiff Amy Robinson purchased Defendant's ArtNaturals-branded hand sanitizer products in or about May of 2020 from a Wal-Mart store in Dallas, Texas, for personal, family, and household use. Prior to purchasing these products, Plaintiff Amy Robinson reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Amy Robinson would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

27.    On personal knowledge, Plaintiff Donald Boorman is a natural person and a resident of Washington. Plaintiff Donald Boorman purchased one bottle of Defendant's ArtNaturals-branded hand sanitizer products in July of 2021 from a Wal-Mart store in Colbert, Washington. Prior to purchasing these products, Plaintiff Donald Boorman reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Donald Boorman would not

(indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

28.     On personal knowledge, Plaintiff Kenneth Scantlin is a natural person and a resident of Oregon. Plaintiff Kenneth Scantlin purchased two bottles of Defendant's ArtNaturals-branded hand sanitizer products in July of 2021 from Amazon.com while in Salem, Oregon. Prior to purchasing these products, Plaintiff Kenneth Scantlin reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Kenneth Scantlin would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

29.     On personal knowledge, Plaintiff Shelley Howe is a natural person and a resident of Idaho. Plaintiff Shelley Howe purchased one bottle of Defendant's ArtNaturals-branded hand sanitizer products in July of 2021 from a Wal-Mart store in Nampa, Idaho. Prior to purchasing these products, Plaintiff Shelley Howe reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Shelley Howe would not (indeed, could not) have purchased Defendant's hand sanitizer products but for Defendant's concealment of the actual or potential presence of benzene in those products.

30.     On personal knowledge, Plaintiff Mark Sophocles is a natural person and a resident of Pennsylvania. Plaintiff Mark Sophocles purchased four bottles of Defendant's ArtNaturals-branded hand sanitizer products in July of 2021 from Amazon.com while in Berwyn Pennsylvania. Prior to purchasing these products, Plaintiff Mark Sophocles reviewed the product label, which contained no disclosure of the actual or potential presence of benzene. Plaintiff Mark Sophocles would not (indeed, could not) have purchased Defendant's hand sanitizer products but for

Defendant's concealment of the actual or potential presence of benzene in those products.

31.     Defendant Virgin Scent, Inc. d/b/a Artnaturals, Inc. is a corporation incorporated in the state of California with a principal place of business at 16325 South Avalon Boulevard, Gardena, California 90248.  Defendant conducts substantial business throughout the United States with its manufacturing, shipping, advertising and promotion of the Product taking place in California and emanating from this State to throughout the United States.

32.     At all times mentioned herein, each Defendant, whether actually or fictitiously named as DOES 1-10 in this Complaint, was the principal, agent, or employee of each other Defendant, and in acting as such principal, or within the course and scope of such employment or agency, conspired with the other Defendants to take part in the acts and omissions as set forth below, by reason of which each Defendant is liable to Plaintiffs, the proposed Class, and the general public for the relief prayed for herein.

## JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

34.     This Court has personal jurisdiction over this action because Defendant is incorporated and maintains its principal place of business in California, and is therefore subject to general jurisdiction in California.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant maintains its principal place of business in this District.

## FACTS COMMON TO ALL CLAIMS

36.     Hand sanitizers are considered OTC drug products regulated by FDA.[12] As such, they must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state-law analogues, including California's Sherman Law. Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[13] 21 C.F.R. 201.66 establishes labeling requirements for OTC products and defines an inactive ingredient as "any component other than an active ingredient." An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. *The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form* intended to furnish the specified activity or effect." (emphasis added).

37.     Until early March 2020, the FDA did not allow *any* benzene in hand sanitizer products given its carcinogenic and reproductive toxicity potential. With the onset of the COVID-19 pandemic, however, demand for hand sanitizer products increased tremendously, vastly exceeding available supply. Many companies, including Defendant, began substantial increases in manufacturing, distributing, marketing, and selling hand sanitizer products to take advantage of unprecedented consumer demand.

38.     In early March, 2020, the FDA issued a Temporary Policy for Preparation of Certain Alcohol-Based Hand Sanitizer Products During the Public Health Emergency (COVID-19), Guidance for Industry. This policy was issued "to communicate its policy for the temporary preparation of certain alcohol-based hand sanitizer products by firms that register their establishment with FDA as an over-the-

---

[12] https://www.fda.gov/drugs/information-drug-class/qa-consumers-hand-sanitizers-and-covid-19
[13] https://www.fda.gov/media/72250/download

counter (OTC) drug manufacturer, re-packager, or re-labeler to prepare alcohol-based hand sanitizers under the circumstances described in this guidance ('firms') for the duration of the public health emergency[.]"[14] This policy has been updated several times since it was first implemented.

39.     Among the interim limits on ethanol-related impurities established in the FDA policy were limits on benzene, for which the FDA established an interim limit of 2 parts per million ("PPM"). The FDA policy admonished that firms marketing alcohol-based hand sanitizer products "should test the ethanol (or have a third-party laboratory conduct testing) to identify the levels of impurities listed in the USP monograph as well as any other potentially harmful impurities that may be present given the manufacturing environment."[15]  Notably, the 2 PPM limit applies to liquid hand sanitizers, not gel or foam products.  Therefore, Defendant's Product, a gel product, should not contain any benzene, and therefore, its sale is in violation of FDCA laws and regulations. See 21 U.S.C. § 331(a); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

40.     An OTC drug label that omits or misstates ingredients renders the drug misbranded.[16] The manufacture, sale, or distribution of adulterated or misbranded products is prohibited under the FDCA and also under analogous state laws, including California's Sherman Law, which similarly prohibits the distribution or sale of products that are adulterated, misbranded, or mislabeled. *See* Cal. Health and Safety Code Section 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular").

41.     In addition, California's Proposition 65 also prohibits the sale of any product containing benzene, a known and enumerated carcinogen and reproductive

---

[14] https://www.fda.gov/media/136289/download
[15] *Id.*
[16] 21 C.F.R. §§ 201.6 and 201.10.

toxin, without providing a clear and conspicuous warning to consumers of the presence thereof, which Defendant failed to provide.

42.     As sold, the Product was both adulterated and misbranded under both federal and California law.

43.     Under the Sherman Law (Cal. Health and Safety Code § 111440 *et seq.*), it is unlawful for any person to misbrand any drug; to manufacture, sell, deliver, hold, or offer for sale any drug that is misbranded; or for any person to receive in commerce any drug that is misbranded or to deliver or proffer for delivery any such drug. It is thus unlawful under California law for Defendant to sell its hand sanitizer product if it contains even low levels of benzene.  It is similarly prohibited to sell any drug that is adulterated.  Defendant's Product is misbranded because it does not disclose the actual or potential presence of any benzene, nor does Defendant disclose anywhere else the actual or potential presence of benzene in its hand sanitizer products. Defendant's Product is adulterated because it fails to conform to cGMP requirements and appropriate testing protocols.  Defendant did not appropriately test its hand sanitizer products for the presence of benzene.

44.     On March 24, 2021, Valisure, an independent analytical laboratory that is accredited to 2017 International Organization for Standardization ("ISO") 17025 standards for chemical testing and is registered with the FDA and the Drug Enforcement Administration, tested and detected high levels of benzene in Defendant's Product. Based on the dangerously high levels of benzene detected in Defendant's Product (and others), Valisure submitted a citizen petition to the FDA reporting the results of its testing and requesting that the FDA take action.[17]  The FDA has taken no public formal action to date.

45.     The hand sanitizer products with the highest levels of benzene in Valisure's testing were those manufactured, marketed, and sold by Defendant. Two

[17] https://www.valisure.com/wp-content/uploads/Valisure-FDA-Citizen-Petition-on-Hand-Sanitizer-v4.14.pdf

samples of Defendant's ArtNaturals-branded hand sanitizer products tested by Valisure contained benzene at 16.1 and 15.2 PPM—approximately eight times the emergency, interim limit established by the FDA (even assuming those limits are applicable).[18]  All samples also tested above zero PPM—the level permissible prior to the FDA's emergency, interim policy as well as under state law such as Proposition 65, and the level actually applicable to Defendant's hand sanitizer products. As benzene was found in all samples of Defendant's products that were tested, the presence of benzene is pervasive throughout Defendant's products. Because the actual or potential presence of benzene is not disclosed, there is no way for a consumer to tell or to know whether Defendant's hand sanitizer products contain benzene. No reasonable consumer would take the risk that the product they purchase might contain benzene at multiple times the emergency, interim limit established by the FDA, or was illegal to sell or receive.

46.     As a manufacturer, distributor, and seller of an OTC drug product, Defendant had and has a duty to ensure that its hand sanitizer products do not contain excessive (or any) levels of benzene, including through regular testing. Based on the testing results set forth above, Defendant made no reasonable effort to test its hand sanitizer products for benzene or other impurities.  Nor did it disclose to Plaintiffs or any other consumers in any product advertising, labeling, packaging, or marketing that its hand sanitizer products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

47.     When Plaintiffs purchased Defendant's ArtNaturals-branded hand sanitizer products, Plaintiffs did not know, and had no reason to know, that

---

[18] *Id*.

Defendant's hand sanitizer products were adulterated and misbranded and thus unlawful to sell or purchase as set forth herein.  Not only would Plaintiffs not have purchased Defendant's hand sanitizer products at all had they known the products contained benzene, they would not have been capable of purchasing them if Defendant had done as the law required and tested those products for benzene and other carcinogens, reproductive toxins, and impurities. Moreover, no reasonable consumer would have paid any amount for hand sanitizer products containing any amount of benzene, a known carcinogen and reproductive toxin, much less multiples of the emergency, interim limit set by the FDA (even assuming those allowances apply to Defendant's products). Thus, if Plaintiffs and Class members had been informed that Defendant's hand sanitizer products contained or may contain benzene, they would not have purchased or used the products at all, making such omitted facts material to them.

48.     Had Defendant adequately tested its hand sanitizer products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its products contained benzene at levels far above the FDA's emergency, interim limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

49.     Defendant has sold its hand sanitizer products directly to consumers through its website throughout the COVID-19 pandemic. In fact, Defendant continues to sell its ArtNaturals-branded hand sanitizer products on its website even weeks after the results of Valisure's testing were made public. Nowhere on Defendant's website is the presence of benzene in its hand sanitizer products disclosed by Defendant.

50.     Defendant's undisclosed inclusion of benzene at levels far exceeding the emergency, interim limit set by the FDA renders its hand sanitizer products unapproved, misbranded, mislabeled, and/or adulterated under federal and state law.

51.     Defendant has violated California Health & Safety Code § 110390, which makes it unlawful to disseminate false or misleading drug advertisements or statements on products or product packaging, labeling, or any other medium.

52.     Defendant has violated California Health & Safety Code § 110395, which makes it unlawful to manufacture, sell, deliver, hold, or offer for sale any drug that is falsely advertised.

53.     Defendant has violated California Health & Safety Code §§ 110398 and 110400, which make it unlawful to advertise any drug that is adulterated or misbranded, or to deliver or proffer for delivery any such product.

54.      While Defendant's conduct violates both federal and state law, the claims asserted herein are not and cannot be completely resolved by federal or state administrative agencies, nor do they need to be referred to such agencies in the first instance.  The matters alleged herein are not within the particularized expertise of those agencies or do not need to be decided by those agencies in the first instance. Nor do the claims at issue raise particularly novel or complex issues – the simple questions raised by the claims here are whether the products contained impermissible levels of benzene, whether the products are considered adulterated or misbranded and thus illegally to purchase or sell, and whether reasonable consumers would find the presence of a carcinogen in a hand sanitizer products material in making their purchase decision.

55.     No state or federal agency has the authority to provide the complete relief sought by Plaintiffs in this Complaint, nor has Congress or the legislature of this State placed any relevant federal or state agency in control of resolving the issues raised in this action.  The products at issue are not subject to a comprehensive regulatory scheme; indeed, there may not be any regulatory authority over the Products, as alleged above. To Plaintiffs' knowledge there are no ongoing FDA or state level rulemaking proceedings or other regulatory actions being considered by

federal or state agencies addressing the appropriate levels of benzene in hand sanitizer products, nor any indication of any government agency taking any action in terms of exercising extensive rulemaking authority or expressing interest in addressing the specific subject matter of this litigation. Nor are there any pending federal or state administrative agency warning letters, investigations or lawsuits arising out of such claims.  Nor to Plaintiffs' knowledge has any federal or state agency authorized, permitted or condoned adding benzene into hand sanitizer products at the levels found in the Products.

56.     This action does not present an issue outside the conventional experience of this Court, as courts have extensive experience enforcing statutes prohibiting illegal business practices or resolving claims alleging misrepresentations or omissions of material fact on product labels.  Allegations of deceptive labeling such as at issue here do not necessarily require the expertise of the FDA or state regulatory agencies to be resolved in the courts, as courts can routinely decide whether such conduct is misleading or likely to mislead reasonable consumers.  This is the case even where the claims asserted arise out of statutes prohibiting the illegal sale of misbranded or adulterated products, and even if those products are subject to certain state or federal regulations.

57.     Thus there is no reason for this Court to defer prosecution or litigation of a case alleging violations of such state and federal regulations or conduct constituting illegal business practices pending any initial decision making by any relevant state or federal agency, as there is no indication there is any state or federal agency that has particularized special expertise in this area that requires uniformity in administration, or that there are any ongoing or contemplated proceedings that may materially impact the Court's factual or legal findings in this action. The claims at issue can be fully adjudicated without first invoking agency expertise on any

particular issue as there is no initial decision-making responsibility that should first be performed by a relevant federal or state agency.

58.     Plaintiffs' and Class members' purchases of Defendant's hand sanitizer products injured or damaged them because adulterated and misbranded products cannot be legally sold, received, possessed, advertised, or delivered; have no economic value; and are legally worthless. Further, by having purchased and used Defendant's hand sanitizer products Plaintiffs and Class members were exposed to dangerously high levels of the known carcinogen and reproductive toxin benzene.

59.     Defendant acted unlawfully, unfairly, unethically, and in a misleading manner when it unlawfully sold adulterated and misbranded products containing undisclosed and unlawful levels of the carcinogen and reproductive toxin benzene. For the reasons set forth above, such transactions are prohibited by law.

60.     Given Defendant's ongoing business acts and practices, Plaintiffs are unable to rely on Defendant's advertising or labeling in the future, and so will not purchase the product, although they would if it were sold as advertised, reformulated and made free of benzene and other undisclosed impurities. As a result, Plaintiffs have standing to seek injunctive relief. Also, as a person who has suffered injury in fact and lost money or property as a result of Defendant's unlawful, unfair, and fraudulent business acts and practices, each Plaintiff has standing to seek injunctive relief for themselves, the Class, and for the benefit of the general public for conduct arising in and emanating from California pursuant to *McGill v. Citibank, N.A.,* (2017) 2 Cal. 5th 945, 959-60.

## **CLASS ACTION ALLEGATIONS**

61.     Plaintiffs seek to represent a class defined as all persons in the United States who purchased the Hand Sanitizer (the "Class").

62.      Plaintiff Slaughter also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Alabama (the "Alabama Subclass").

63.     The Saiki Plaintiffs also seek to represent a subclass of all Class members who purchased the Hand Sanitizer in Illinois (the "Illinois Subclass").

64.     Plaintiff Pinghera also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in New York (the "New York Subclass").

65.     Plaintiff McIntyre also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Minnesota (the "Minnesota Subclass").

66.     Plaintiff Duarte also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in California (the "California Subclass").

67.     Plaintiff Pichardo also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Florida (the "Florida Subclass").

68.     Plaintiff Robinson also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Texas (the "Texas Subclass").

69.     Plaintiff Boorman also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Washington (the "Washington Subclass").

70.     Plaintiff Scantlin also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Oregon (the "Oregon Subclass").

71.     Plaintiff Howe also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Idaho (the "Idaho Subclass").

72.     Plaintiff Sophocles also seeks to represent a subclass of all Class members who purchased the Hand Sanitizer in Pennsylvania (the "Pennsylvania Subclass").

73.     The Class and state subclasses shall collectively be referred to as the "Classes."

74.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

75.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

76.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Plaintiffs reasonably estimate that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiffs, the true number of members of the Classes are known by Defendant, particularly based on significant on-line sales tracked by Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

77.     **Typicality.**  The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all members of the Classes, purchased the Hand Sanitizer, which was worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiffs, like all members of the Classes, have been damaged by Defendant's misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

78.     **Existence and predominance of common questions of law and fact.**
Common questions of law and fact exist as to all members of the Classes and
predominate over any questions affecting only individual members of the Classes.
These common legal and factual questions include, but are not limited to, the
following:

    (a)    whether the Hand Sanitizer manufactured by Defendant contains
            dangerously high levels of benzene, thereby breaching the express
            and implied warranties made by Defendant and making the Hand
            Sanitizer unfit for human use and therefore unfit for its intended
            purpose;

    (b)    whether Defendant knew or should have known that the Hand
            Sanitizer contained elevated levels of benzene prior to selling it,
            thereby constituting fraud;

    (c)    whether Defendant is liable to Plaintiffs and the Classes for unjust
            enrichment;

    (d)    whether Defendant is liable to Plaintiffs and the Classes for fraud;

    (e)    whether Plaintiffs and the Classes have sustained monetary loss and
            the proper measure of that loss;

    (f)    whether Plaintiffs and the Classes are entitled to declaratory and
            injunctive relief;

    (g)    whether Plaintiffs and the Classes are entitled to restitution and
            disgorgement from Defendant; and

    (h)    whether the marketing, advertising, packaging, labeling, and other
            promotional materials for the Hand Sanitizer are deceptive.

79.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately
protect the interests of the Classes.  Plaintiffs have retained counsel who are highly
experienced in complex consumer class action litigation, and Plaintiffs intend to

vigorously prosecute this action on behalf of the Classes.  Plaintiffs have no interests that are antagonistic to or that irreconcilably conflict with those of the Classes.

80.     **Superiority.**  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

81.     In the alternative, the Classes may be certified because:

(a)     the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

(b)     the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate

final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION
## COUNT I
## BREACH OF EXPRESS WARRANTY

82.     Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

83.     Plaintiffs bring this claim individually and behalf of the members of the proposed Classes against Defendant.

84.     In connection with the sale of the Hand Sanitizer, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Product was a hand sanitizer that contained only those active and inactive ingredients listed on the Hand Sanitizer's labels.  Those active and inactive ingredients do not include benzene, a known human carcinogen dangerous to humans.  Defendant further expressly warranted that the Product is a hand sanitizer used for cleaning and/or sterilizing hands, rather than adulterated hand sanitizer containing dangerous chemicals.

85.     As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and the members of the Classes have been injured and harmed because they would not have purchased the Hand Sanitizer on the same terms if they knew that the Hand Sanitizer contained benzene and are not generally recognized as safe.

86.     Prior to filing this complaint, Defendant or their representatives were served with notice letters on behalf of the Classes that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiffs' counsel sent Defendant letters advising them that Defendant breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  Despite receiving such letters, Defendant failed to take any action or offer any relief to members of the Classes.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
## BREACH OF IMPLIED WARRANTY

87.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

88.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

89.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Hand Sanitizer (i) would not contain elevated levels of benzene and (ii) is generally recognized as safe for human use.

90.     Defendant breached the warranty implied in the contracts for the sale of Hand Sanitizer because the Hand Sanitizer could not pass without objection in the trade under the contract description, the Products were not of fair or average quality within the description, and the Hand Sanitizer was unfit for its intended and ordinary purpose because the Hand Sanitizer manufactured, distributed, and sold by Defendant was defective in that it contained elevated levels of carcinogenic and toxic benzene, and as such is not generally recognized as safe for human use.  As a result, Plaintiffs and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

91.     Plaintiff and members of the Classes purchased the Hand Sanitizer in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the particular purpose of being used as a safe and effective hand sanitizer product.

92.     The Hand Sanitizer was not altered by Plaintiffs or members of the Classes.

93.     The Hand Sanitizer was defective when it left the exclusive control of Defendant.

94.     Defendant knew that the Hand Sanitizer would be purchased and used

without additional testing by Plaintiffs and members of the Classes.

95.     The Hand Sanitizer was defectively manufactured and unfit for its intended purpose, and Plaintiffs and members of the Classes did not receive the goods as warranted.

96.     In addition, and as a separate basis to assert a claim for breach of these implied warranties, the presence of a hazardous substance as set forth above constitutes a latent defect in the products that existed at a time of purchase but was undiscoverable by Plaintiffs and Class members at time of sale.  If these defects were known the products would not have been saleable for the reasons set forth above and would not measure up to the descriptions of the products given by the Defendant.

97.     Plaintiff and Class members purchased the products from Defendant or its agents, who were in the business of selling these products to consumers.  To the extent any warranties were provided by Defendant to these agents, Plaintiffs and Class members were intended third party beneficiaries of such warranties and thus may assert such claims directly against the Defendant.

98.      As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Classes have been injured and harmed in an amount according to proof at time of trial.

## COUNT III

**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,**
**15 U.S.C. § 2301, *et seq.***

99.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs above.

100.    Defendant is a "warrantor," and Plaintiffs and Class members are "consumers," under the Magnuson-Moss Warranty Act.

101.    As alleged above, Defendant expressly and impliedly warranted its hand sanitizer products.

102.   Within the meaning of 15 U.S.C. § 2310(d)(1), Plaintiffs and Class members were "damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract."

103.   As alleged above, at least one of the Plaintiffs, prior to filing of this Complaint, made a request in writing that Defendant provide an appropriate correction, replacement, or other remedy to all persons who purchased its hand sanitizer products, but Defendant has not yet provided such a remedy and if fact continues to sell its misbranded and adulterated products directly to customers through its website and to retailers.  Plaintiffs bring this claim seeking such damages in an amount according to proof at time of trial.

104.   Under 5 U.S.C. § 2310(d)(2), a prevailing plaintiff is also entitled to an award of attorneys' fees and expenses, and Plaintiffs bring this claim seeking such relief.

## COUNT IV

### RESTITUTION, COMMON COUNTS, UNJUST ENRICHMENT, QUASI-CONTRACT AND/OR ASSUMPSIT

105.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs above. This Cause of Action is not derivative of the other Causes of Action asserted above, but rather is recognized as a separate and independent Cause of Action that may be submitted to the jury as an alternative to a claim for breach of contract.

106.   Plaintiffs and Class members assert a claim for equitable restitution and/or restitutionary damages at law based on the principles of restitution, unjust enrichment, common counts such as monies had and received and mistaken receipt or retention of monies, implying an obligation at law based on principles of quasi-contract and/or the common-law principle of assumpsit, as alleged herein.

107.   Defendant was unjustly enriched at the expense of Plaintiffs and Class members as a consequence of Plaintiffs and Class members paying monies for Defendant's wholly worthless and illegal hand sanitizer products.

108.   Defendant must restore to Plaintiffs and Class members money that Defendant received as a result of their purchases but that should belong to Plaintiffs and Class members, as Defendant knew or had reason to know that its hand sanitizer products did not conform to their represented characteristics and could not lawfully be sold in and from California, or anywhere in the United States. Those products were misbranded, mislabeled, and adulterated under the FDCA and the Sherman Law and thus were unlawful to sell.

109.   Plaintiffs and Class members conferred a benefit upon Defendant by purchasing the products at issue. Defendant, having been unjustly conferred a benefit through illegal conduct as set forth above, and having received such benefits using misleading and illegal acts and practices, and omitting material facts as set forth in detail above, is required to make restitution. The circumstances are such that, as between the two, it is unjust for Defendant to retain such a benefit based on the conduct described above. Such money or property belongs in good conscience to Plaintiffs and Class members and can be traced to funds or property in Defendant's possession or made as a result thereof. Defendant has received a benefit from Plaintiffs and Class members in the form of monies paid by them for the products at issue and is unjustly retaining that benefit at the expense of Plaintiffs and Class members. The unjustified charging and retention of monies from sales of products that were not lawful and that passed through Defendant entitles Plaintiffs and Class members to restitution and disgorgement of such monies.

110.   Defendant entered into a series of implied-at-law obligations that resulted in a sum certain as stated above being had, received, and/or unjustly retained by Defendant, either directly or indirectly, at the expense of Class members.

CONSOLIDATED CLASS ACTION COMPLAINT                                        30
CASE NO. 2:21-CV-02948-VAP-E

Defendant had knowledge of such benefits. Defendant owes Class members specific sums that can be calculated based on the records of Defendant. Under established principles of quasi-contract and assumpsit under California law, Defendant has an obligation created by law to restore Plaintiffs and Class members to their former position by returning the monies paid for the products it could not lawfully sell and thus is not lawfully entitled to retain. The specific sum certain to which Plaintiffs and Class members are entitled is the purchase price of the products, plus interest thereon. This obligation is imposed by law, regardless of the intent of the parties. Rather, equity and good conscience dictate that under the circumstances Defendant as the benefitted party should make reimbursement of the monies paid for the products to Plaintiffs and Class members. Such monies were received by Defendant and were not intended to be used for Plaintiffs' and Class members' benefit, but rather for its own profit.

111.    Pursuant to California Civil Code § 2224, one who gains or retains a thing (including money) by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, unless they have some other and better right thereto, is an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it. Based on the facts and circumstances alleged above, in order to prevent unjust enrichment and to prevent Defendant from enjoying the fruits of its wrongdoing, Plaintiffs and Class members are entitled to the establishment of a constructive trust, in a sum certain, of all monies that have been improperly retained by Defendant, as well as monies made by Defendant on such payments, from which Plaintiffs and Class members may seek restitution.

112.    In addition, in light of Defendant's knowledge of the true facts as set forth above, Defendant's conduct warrants an assessment of exemplary damages under this independent cause of action, in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof. Plaintiffs also

request an order for an accounting and prohibiting Defendant from failing and refusing to immediately cease the wrongful conduct as set forth above and enjoining Defendant from continuing to make the misleading claims at issue herein.

## COUNT V

### FRAUD AND DECEIT

113.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

114.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

115.   As discussed above, Defendant provided Plaintiffs and members of the Classes with materially false or misleading information about the Hand Sanitizer manufactured by Defendant.  Specifically, Defendant has marketed the Hand Sanitizer as safe for human use.  As indicated above, however, these representations are false and misleading as Defendant's Hand Sanitizer contained elevated levels of benzene, and carcinogenic and toxic chemical impurity.

116.   Defendant also materially omitted key facts regarding the true nature of the Product, specifically that the Product contained dangerous levels of benzene, was adulterated, and was unsafe for use as a hand sanitizer – facts going directly to the safety of the use of the Product.  Had Plaintiffs and members of the Classes been apprised of these presumptively material facts, they would have been aware of them and would not have purchased the Hand Sanitizer.

117.   The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiffs and members of the Classes reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and members of the Classes to purchase defective and falsely labeled Hand Sanitizer.

118.   Defendant knew or should have known that its Hand Sanitizer was contaminated with this harmful impurity, but continued to manufacture it

nonetheless.  Pursuant to FDA guidance, Defendant was required to engage in impurity testing to ensure that harmful impurities such as benzene were not present in the Product.  Had Defendant undertaken proper testing measures, it would have been aware that the Product contained dangerously high levels of benzene.  During this time, Plaintiffs and members of the Classes were using the Hand Sanitizer without knowing it contained dangerous levels of benzene.

119.   The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Classes, who are entitled to damages and other legal and equitable relief as a result.

120.   As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI

**VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT, CALIFORNIA CIVIL CODE §§ 1750, *et seq.***

121.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

122.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.  Plaintiff Duarte also brings this claim on behalf of the California Subclass.

123.   California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

124.   California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(7), prohibits "[r]epresenting that goods or services are of a particular

standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

125.   California's Consumers Legal Remedies Act, Cal. Civ. Code § 1770(a)(9), disallows "[a]dvertising goods or services with intent not to sell them as advertised."

126.   Defendant is a "person" within the meaning of California Civil Code sections 1761(c) and 1770 and provided "goods" within the meaning of sections 1761(a) and 1770.

127.   Plaintiffs, the other members of the Classes, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

128.   Defendant's acts and practices, as alleged in this complaint, violate the CLRA because they include unfair and deceptive acts and practices in connection with transactions (the sale of the Hand Sanitizer).

129.   As alleged more fully above, Defendant violated the CLRA by falsely representing to Plaintiffs and the other members of the Classes that Hand Sanitizer (i) would not contain elevated levels of benzene and (ii) is generally recognized as safe for human use.  In fact, the Hand Sanitizer contained elevated levels of benzene and was not safe for human use.

130.   These misrepresentations constitute "unfair or deceptive acts or practices" that are prohibited by the CLRA, Cal. Civ. Code §§ 1770(a)(5); 1770 (a)(7); 1770(a)(9); 1770(a)(16).

131.   Further, Defendant concealed from and failed to disclose to Plaintiffs and the Classes that its Hand Sanitizer did not conform to the product's labels, packaging, advertising, and statements in that it contained elevated levels of benzene and was not safe for human use.

132.   Defendant had a duty to disclose to Plaintiffs and members of the Classes the true quality, characteristics, ingredients, nutrient levels, and suitability of

the Hand Sanitizer because Defendant was in a superior position to know the true nature of their products and Defendant knew that Plaintiffs and members of the Classes could not reasonably have been expected to learn or discover that the Hand Sanitizer was misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Hand Sanitizer.

133.   The facts concealed or not disclosed by Defendant to Plaintiffs and members of the Classes were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Hand Sanitizer.

134.   Plaintiffs' and members of the Classes' reliance on these omissions was reasonable given Defendant's advertising, representations, warranties, and general promotions of the Hand Sanitizer.

135.   Plaintiffs and members of the Classes did not know that Defendant was concealing or otherwise omitting material facts.

136.   Prior to filing this Complaint, CLRA notice letters were sent to Defendant that complies in all respects with California Civil Code § 1782(a). Plaintiffs' counsel sent Defendant the letter via certified mail, return receipt requested, advising Defendant that it is in violation of the CLRA and demanding that it cease and desist from such violations.  More than 30 days have elapsed since receipt of this letter, and Defendant has failed and refused to offer an appropriate replacement, refund, correction or other remedy.

137.   As a direct and proximate result of Defendant's violations of the CLRA, Plaintiffs and the Classes are entitled to (a) actual damages, in an amount to be proven at trial; (b) injunctive relief ensuring Defendant issues a recall of its Hand Sanitizer and complies with all proper quality and safety standards going forward; (c) punitive damages; (d) Plaintiffs' and the Classes' reasonable attorneys' fees; and (e) any other relief which the Court deems just and proper..

## COUNT VII

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200,** *et seq.*

138.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint, except any allegations as to entitlement to damages.

139.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.  Plaintiff Duarte also brings this claim on behalf of the California Subclass.

140.   By committing the acts and practices alleged herein, Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to the Classes, by engaging in unlawful, fraudulent, and unfair conduct.

141.   Defendant violated the UCL's proscription against engaging in unlawful conduct as a result of its violations of the CLRA, Cal. Civil Code §§ 1770(a)(5), (a)(7) and (a)(9), as well as its violation of provisions of the FDCA and California's Sherman Law, which prohibits the sale of adulterated and misbranded drugs.  The Product is adulterated because "it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."  21 U.S.C. § 351(a)(1); Cal. Health & Safety Code § 111260.  Specifically, in issuing guidance to the industry, the FDA indicated that "[i]f a firm wishes to use or supply a fuel or technical grade ethanol that does not meet USP or FCC requirements, the firm should test the ethanol (or have a third party laboratory conduct testing) to identify the levels of impurities listed in the USP monograph as well as any other potentially

harmful impurities that may be present given the manufacturing environment."[19]

The Product is misbranded because it is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1); Cal. Health & Safety Code § 111330 ("Any drug or device is misbranded if its labeling is false or misleading in any particular.").

142. Defendant's acts and practices described above also violate the UCL's proscription against engaging in fraudulent conduct. As more fully described above, Defendant marketed the Hand Sanitizer as safe for human use. As indicated above, however, these representations are false and misleading as Defendant's Hand Sanitizer contained elevated levels of benzene. These representations were likely to deceive reasonable consumers. Defendant also engaged in material omissions by failing to disclose to Plaintiffs and Class members that the Product contained the harmful impurity benzene, which Defendant knew or should have known was contained in the Product.

143. The UCL also prohibits "unfair" business acts and practices. As the conduct at issue is not conduct directed as between competitors but conduct directed at purchasers and consumers of the hand sanitizer products at issue, there are several tests that determine whether a practice is "unfair," examining the practice's impact on the public balanced against the reasons, justifications, and motives of Defendant:

   (a) does the practice offend an established public policy, as here the practices at issue offend the policies against harming competition by engaging in misleading advertising and sales practices, as reflected in the laws and policies set forth herein;

   (b) balancing the utility of Defendant's conduct against the gravity of the harm created by that conduct, including whether Defendant's practice

---

[19] TEMPORARY POLICY FOR PREPARATION OF CERTAIN ALCOHOL-BASED HAND SANITIZER PRODUCTS DURING THE PUBLIC HEALTH EMERGENCY (COVID-19) GUIDANCE FOR INDUSTRY (Feb. 10, 2021), at 11, https://www.fda.gov/media/136289/download

caused substantial injury to consumers with little to no countervailing legitimate benefit that could not reasonably have been avoided by the consumers themselves; or

(c)     is the practice immoral, unethical, oppressive, unscrupulous, unconscionable, or substantially injurious to consumers.

Based on the facts alleged above, Defendant's acts and practices qualify as an "unfair" business practices under any of these standards.

144.    Defendant's acts and practices described above also violate the UCL's proscription against engaging in unfair business practices, as there is no benefit to consumers or competition from deceptively marketing and omitting material facts about the contaminated nature of the Hand Sanitizer. The gravity of the consequences of Defendant's conduct as described above outweighs any justification, motive, or reason therefor, particularly considering the available legal alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the Classes.

145.    Plaintiffs and the other members of the Classes had no way of reasonably knowing that the Hand Sanitizer they purchased was not as marketed, advertised, packaged, or labeled. Plaintiffs and the other member of the Classes are not able to test for the presence of benzene in their Hand Sanitizer. Thus, Plaintiffs and the other members of the Classes could not have reasonably avoided the injury each of them suffered.

146.    Defendant's violation has continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct. The public and Class members are subject to ongoing harm because Defendant has not issued a recall for its contaminated Hand Sanitizer.

CONSOLIDATED CLASS ACTION COMPLAINT                                                      38
CASE NO. 2:21-CV-02948-VAP-E

147.   Plaintiffs and the other members of the Classes suffered a substantial injury and loss of money or property by virtue of buying the Hand Sanitizer that they would not have purchased at the prices they did, if at all, absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions about the contaminated nature of its Hand Sanitizer. Plaintiffs and the members of the Classes lost money or property as a result of Defendant's UCL violations because:  (a) they would not have purchased the Hand Sanitizer on the same terms if they knew that the Hand Sanitizer contained harmful levels of benzene, and is not generally recognized as safe for human use; and (b) the Hand Sanitizer does not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

148.   Pursuant to California Business and Professional Code § 17203, Plaintiffs and the Classes seek an order of this Court that includes, but is not limited to, an order requiring Defendant to: (a) provide restitution to Plaintiffs and the other member of the Classes; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiffs' and the Classes' attorneys' fees and costs.

<u>COUNT VIII</u>
**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW, CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17500,** *et seq.*

149.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint, except any allegations as to entitlement to damages.

150.   Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.  Plaintiff Duarte also brings this claim on behalf of the California Subclass.

151.   California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state or to make or disseminate or cause to be made or disseminated from this state before the public in any state … in

CONSOLIDATED CLASS ACTION COMPLAINT                                              39
CASE NO. 2:21-CV-02948-VAP-E

any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

152.   Defendant committed acts of false or misleading advertising, as defined by Bus. & Prof. Code § 17500, by failing to disclose that the Hand Sanitizer contained benzene, a carcinogenic chemical impurity, which rendered the Hand Sanitizer unsafe for human use.

153.   Defendant either knew or should have known, through the exercise of reasonable care that its representations or omissions of material facts about the Hand Sanitizer as set forth above were untrue and misleading.

154.   Defendant's actions in violation of Bus. & Prof. Code § 17500 were false and misleading such that the general public is and was likely to be deceived.

155.   Plaintiffs and the Classes lost money or property as a result of Defendant's violations of Bus. & Prof. Code § 17500 because: (a) they would not have purchased the Hand Sanitizer on the same terms if the true facts were known about the product; (b) the Hand Sanitizer was worthless because it contained elevated levels of the carcinogen, benzene, and was therefore not safe for human use, and (d) the Hand Sanitizer did not have the characteristics as promised by Defendant.

## COUNT IX
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT, 815 ILCS 505/1, *et seq.*

156.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

157.   The Saiki Plaintiffs bring this claim individually and on behalf of the members of the proposed Illinois Subclass against Defendant.

CONSOLIDATED CLASS ACTION COMPLAINT                                    40
CASE NO. 2:21-CV-02948-VAP-E

158.   The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1, et seq., prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

159.   Defendant committed deceptive acts and practices which include, without limitation, misrepresenting that the Hand Sanitizer (i) would not contain dangerously high levels of benzene and (ii) is generally recognized as safe for human use.

160.   Defendant intended that the Saiki Plaintiffs and each of the other members of the Illinois Subclass would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

161.   Defendant's deceptive acts and practices occurred in the course of trade or commerce, as the Hand Sanitizer is a widely sold consumer good.

162.   As a direct, foreseeable, and proximate cause of the Defendant's unfair and deceptive acts or business practices, the Saiki Plaintiffs and each of the other members of the Illinois Subclass have sustained damages in an amount to be proven at trial because: (a) they would not have purchased the Hand Sanitizer on the same terms if they knew that the Hand Sanitizer contained high levels of benzene; and (b) the Hand Sanitizer does not have the characteristics, uses, benefits, or qualities as promised.

163.   In addition, Defendant's conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

164.   On April 5, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter on behalf of the Saiki Plaintiffs that complied in all respects with 815 ILCS 505/10a(h).  The Saiki Plaintiffs' counsel sent Defendant letters advising it that Defendant breached the ICFA and demanded that it cease and desist from such breaches and make full restitution by refunding the monies received

therefrom.

## COUNT X

### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349

165.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

166.   Plaintiff Pinghera brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

167.   New York's General Business Law ("GBL") § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

168.   In its sale of goods throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of GBL § 349.

169.   Plaintiff Pinghera and members of the New York Subclass are consumers who purchased products from Defendant for their personal use.

170.   By the acts and conduct alleged herein, Defendant has engaged in deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Hand Sanitizer (i) would not contain dangerously high levels of benzene and (ii) is generally recognized as safe for human use. Defendant also materially omitted key facts regarding the true nature of the Product, specifically that the Product contained dangerous levels of benzene, was adulterated, and was unsafe for use as a hand sanitizer.  Had Plaintiff and members of the New York Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Hand Sanitizer.

171.   The foregoing deceptive acts and practices were directed at consumers.

172.   The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the Hand Sanitizer to induce consumers to purchase the same.  No reasonable consumer would knowingly purchase a topical product that may contain high levels of a known

carcinogen and reproductive toxin and that was illegal to purchase or sell.

173.   By reason of this conduct, Defendant engaged in deceptive conduct in violation of New York's General Business Law.

174.   Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff Pinghera and members of the New York Subclass have sustained from having paid for and used Defendant's products.

175.   As a result of Defendant's violations, Plaintiff Pinghera and members of the New York Subclass have suffered damages because: (a) they paid a premium price in the amount of the full purchase price of the Product based on Defendant's deceptive conduct; and (b) the Hand Sanitizer does not have the characteristics, uses, benefits, or qualities as promised.

176.   On behalf of herself and other members of the New York Subclass, Plaintiff Pinghera seeks to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT XI

## VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 350

177.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

178.   Plaintiff Pinghera brings this claim individually and on behalf of the members of the proposed New York Subclass against Defendant.

179.   New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

180.   Pursuant to said statute, false advertising is defined as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

181.   Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false

advertising in violation of GBL § 350.

182.   Defendant's false, misleading, and deceptive statements and representations of fact were and are directed towards consumers.

183.   Defendant's false, misleading, and deceptive statements and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

184.   Defendant's false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

185.   Defendant also materially omitted key facts regarding the true nature of the Product, specifically that the Product contained dangerous levels of benzene, was adulterated, and was unsafe for use as a hand sanitizer.  Had Plaintiff and members of the New York Subclass been apprised of these facts, they would have been aware of them and would not have purchased the Hand Sanitizer.

186.   As a result of Defendant's false, misleading, and deceptive statements and representations of fact, Plaintiff Pinghera and the New York Subclass have suffered and continue to suffer economic injury.

187.   As a result of Defendant's violations, Plaintiff Pinghera and members of the New York Subclass have suffered damages due to said violations because: (a) they paid a premium price in the amount of the full purchase price of the Product based on Defendant's deceptive conduct; and (b) the Hand Sanitizer does not have the characteristics, uses, benefits, or qualities as promised.

188.   On behalf of herself and other members of the New York Subclass, Plaintiff Pinghera seeks to recover her actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT XII

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STA. §§ 501.201, *et seq.*

189.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

190.   Plaintiff Pichardo brings this claim individually and on behalf of the members of the proposed Florida Subclass against Defendant.

191.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

192.   Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

193.   FDUPTA can be violated in two ways, both of which are relevant to this case.  First, Defendant has committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiff and members of the Florida Subclass.  Second, Defendant has committed a *per se* violation of FDUPTA predicated on a violation of the FDCA.  Specifically, by selling an adulterated and misbranded product which is *per se* illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, and because the FDCA is designed to protect consumers from harmful and dangerous drugs, Defendant has committed *per se* violations of FDUPTA. Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

194.   While FDUPTA does not define "deceptive" or "unfair," Florida courts

have looked to the Federal Trade Commission's interpretations for guidance. "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016). Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

195.   Defendant engaged in conduct that is likely to deceive members of the public. This conduct includes representing that the Product contained only the ingredients listed in the label, which is untrue, and failing to make any mention that the Product contained harmful levels of benzene and was therefore adulterated.

196.   As alleged herein, Plaintiff Pichardo has suffered injury in fact and lost money as a result of Defendant's conduct because he purchased the Product from Defendant in reliance on Defendant's representation that the ingredients in the Product were safe and effective and was not adulterated with benzene, as well as Defendant's material omissions regarding the true nature of the Product.

197.   As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Pichardo and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201-213.

198.   By committing the acts alleged above, Defendant engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

199.   Defendant's conduct is substantially injurious to consumers. Consumers are purchasing and using Defendant's Product without knowledge that the Product is adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Product, which is adulterated with benzene and misbranded, but for Defendant's false labeling, advertising, promotion, and material omissions. Thus, Plaintiff Pichardo and the Florida Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

200.   Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation of the ingredients contained on Product's label and injury resulted from ordinary use of the Product, consumers could not have reasonably avoided such injury.

201.   Further, Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiff Pichardo desires to purchase Defendant's Product in the future if he can be assured that the Product is not adulterated or misbranded and meets the advertising claims on the Product's label.

202.   Accordingly, Defendant is liable to Plaintiff Pichardo and the Florida Subclass for damages in amounts to be proven at trial, including attorneys' fees and costs.

## COUNT XIII
### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT, TEX. BUS. & COM. CODE §§ 17.41, *et seq.*

203.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

204.   Plaintiff Robinson brings this claim individually and on behalf of the Texas Subclass against Defendant.

205.   Defendant engaged in false, misleading, and deceptive practices in violation of the DTPA, which Plaintiff Robinson and other Texas Subclass members relied on to their detriment.

206.   Specifically, by (1) misrepresenting that the Product was fit for use as a gel hand sanitizer when it was not, and (2) failing to disclose the presence of benzene in the Product, Defendant engaged in deceptive business practices prohibited by the Texas DTPA.

207.   Defendant's unfair or deceptive acts and practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Robinson, about the unsafe nature of the Product.  Had Plaintiff Robinson and members of the Texas Subclass known that the Product was contaminated with benzene, they would not have purchased the Product.

208.   Defendant also breached express and implied warranties to Plaintiff Robinson and the Texas Subclass, as set out above, and are therefore liable to Plaintiff Robinson and the Texas Subclass for damages under §§ 17.50(a)(2) and 17.50(b) of the Texas DTPA.  Defendant's actions also constitute an unconscionable action or course of action under § 17.50(a)(3) of the Texas DTPA.

209.   Plaintiff Robinson, prior to filing this Complaint, served Defendant's representative with a demand letter that complies with the requirements of the DTPA.  Defendant has previously received similar demand letters, and has failed and refused to take any appropriate action in response thereto.

210.   Plaintiff Robinson and the Texas Subclass sustained damages as a result of Defendant's unlawful acts and are, therefore, entitled to damages and other relief provided for under § 17.50(b) of the Texas DTPA.  Because Defendant's conduct was committed knowingly and/or intentionally, Plaintiff Robinson and the Texas Subclass are entitled to treble damages.

211.   For Texas Subclass members who wish to rescind their purchases, they

are entitled under § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

212.   Pursuant to DTPA § 17.50(b)(2), Plaintiff Robinson seeks an order enjoining Defendant's acts or failures to act that violate the DTPA.  Pursuant to DTPA § 17.50(b)(3), Plaintiff Robinson and the Texas Subclass seek orders necessary to restore to them all money acquired from them by Defendant in violation of the DTPA.  They also seek orders necessary to restore to Texas Subclass members whose identities are known to or ascertainable by Defendant all money acquired from them by Defendant in violation of the DTPA.  Plaintiff Robinson and the Texas Subclass also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

213.   Pursuant to DTPA § 17.50(b)(4), Plaintiff Robinson and the Texas Subclass seek all other relief which the Court deems proper.

## COUNT XIV

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE § 19.86.010, *et seq.*

214.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

215.   Plaintiff Boorman brings this claim on behalf of himself and the Washington Subclass against Defendant.

216.   Washington's Consumer Protection Act ("WCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce …."  Wash. Rev. Code § 19.86.020.

217.   The actions by Defendant, as set forth at length above, occurred in the conduct of trade or commerce.

218.   By the acts and conduct alleged herein, Defendant has engaged in

deceptive, unfair, and misleading acts and practices, which include, without limitation, misrepresenting that the Product (i) contained no benzene or other harmful impurities; and (ii) are generally recognized as safe for human consumption. Defendant also engaged in material omissions regarding the true nature of the Product by failing to disclose to Plaintiff Boorman and members of the Washington Subclass that the Product in fact contained harmful levels of benzene.

219.   The foregoing deceptive acts and practices were directed at consumers.

220.   The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and quality of the Product, which was manufactured, distributed, and sold by Defendant.

221.   By reason of this conduct, Defendant engaged in deceptive conduct in violation of the Washington Consumer Protection Act which have caused injury to Plaintiff Boorman and members of the Washington Subclass, and had and will continue to have the capacity to injure Mr. Boorman and other persons if Defendant is not stopped from manufacturing, distributing, and selling the defective Product.

222.   Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiff Boorman and members of the Washington Subclass have sustained from having paid for and consumed Defendant's Product.

223.   As a result of Defendant's violations, Plaintiff Boorman and members of the Washington Subclass have suffered damages because: (a) they would not have purchased Defendant's Product on the same terms if they knew that the products contained benzene, and are not generally recognized as safe for human consumption; and (b) Defendant's Product did not have the characteristics, ingredients, uses, or benefits promised.

224.   Plaintiff Boorman, prior to filing this Complaint, served Defendant's representative with a demand letter that complies with the requirements of the WCPA.  Defendant has previously received similar demand letters, and has failed

and refused to take any appropriate action in response thereto.

225.   On behalf of himself and other members of the Washington Subclass, Plaintiff Boorman seeks to enjoin the unlawful acts and practices described herein, to recover all economic damages, treble damages, court costs, attorneys' fees, and any other relief the Court deems just and proper.

226.   Plaintiffs will provide notice of this action and a copy of this Complaint to the appropriate Attorneys General pursuant to Wash. Rev. Code § 19.86.095.

## COUNT XV

**VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT, CODE OF ALABAMA 1975 §§ 8-19-1, *et seq.***

227.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

228.   Plaintiff Slaughter brings this claim on behalf of herself and the Alabama Subclass against Defendant.

229.   Defendant's marketing, sale and/or distribution of the Product and Plaintiff Slaughter and the Alabama Subclass's purchase of the Product was a sale or distribution of goods to a consumer within the meaning of the Alabama Deceptive Trade Practices Act (Code of Alabama 1975 §§ 8-19-1, *et seq.*).

230.   Plaintiff Slaughter and the Alabama Subclass purchased the Product for personal use.

231.   Defendant's acts and practices as described herein have misled and deceived and/or are likely to mislead and deceive the Alabama Subclass and the general public of the State of Alabama. Defendant has advertised, marketed, and sold the Product as set forth herein and specifically claimed the Product was safe and fit for human use. Defendant failed to disclose the material information that the Product contained harmful levels of benzene, and therefore the Product was unsafe and unfit for human use.

232.   By its actions, Defendant disseminated uniform false advertising which

by its nature is unfair, deceptive, untrue, and/or misleading within the meaning of the Alabama Deceptive Trade Practices Act. Such actions are likely to deceive, do deceive, and continue to deceive Plaintiff Slaughter and the Alabama general public for all the reasons detailed herein above.

233.   Defendant intended for Plaintiff Slaughter and the Alabama Subclass to rely on their representations and omissions and Plaintiff Slaughter and the Alabama Subclass did rely on Defendant's misrepresentations and omissions of fact.

234.   The misrepresentations and omissions of fact constitute deceptive, false and misleading advertising in violation of the Alabama Deceptive Trade Practices Act.

235.   By performing the acts described herein Defendant caused monetary damage to Plaintiff Slaughter and the Alabama Subclass of similarly situated individuals.

236.   Plaintiff Slaughter, prior to filing this Complaint, served Defendant's representative with a demand letter that complies with the requirements of the WCPA.  Defendant has received similar demand letters, and has failed and refused to take any appropriate action in response thereto.

237.   Accordingly, Plaintiff requests the following relief both individually and on behalf of the Alabama Subclass:

a.    actual damages sustained by Plaintiff Slaughter and Alabama Subclass or the sum of $100.00, whichever is greater;

b.    three times actual damages;

c.    appropriate injunctive relief in the form of enjoining Defendant from continuing to violate Alabama statutory law;

d.    attorneys' fees and costs; and

e.    such other and further relief as the Court deems proper.

## COUNT XVI
### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
### (OR. REV. STAT. ANN. § 646.605, *et seq.*)

238.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

239.   Plaintiff Scantlin brings this claim on behalf of herself and the Oregon Subclass against Defendant.

240.   Plaintiff Scantlin, members of the Oregon Subclass, and Defendant are "[p]erson[s]" within the meaning of Or. Rev. Stat. Ann. § 646.605(4).

241.   The Product is a "good" within the meaning of Or. Rev. Stat. Ann. § 646.605(6).

242.   Defendant was and is engaged in "[t]rade" or "commerce" within the meaning of Or. Rev. Stat. Ann. § 646.605(8).

243.   The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits "unlawful practice . . . in the course of the person's business." Or. Rev. Stat. Ann. § 646.608(1).

244.   The Oregon UTPA makes unlawful specific acts, including:

a.   "[r]epresent[ing] that . . . goods . . . have . . . characteristics, ingredients, uses, benefits, quantities or qualities that the . . . goods . . . do not have" (Or. Rev. Stat. Ann. § 646.608(1)(e));

b.   "[r]epresent[ing] that . . . goods . . . are of a particular standard, quality, or grade, or that . . . goods are of a particular style or model, if the . . . goods . . . are of another" (Or. Rev. Stat. Ann. § 646.608(1)(g));

c.   "[a]dvertis[ing] . . . goods . . . with intent not to provide the . . . goods . . . as advertised" (Or. Rev. Stat. Ann. § 646.608(1)(i)); and

d.   "[e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce" (Or. Rev. Stat. Ann. § 646.608(1)(u)).

245.   By selling the Product as described herein, Defendant violated the

Oregon UTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the Product, including that such products were unreasonably dangerous and not fit to be used for their intended purpose, as detailed above.

246.   Specifically, by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the Product, including that such products were unreasonably dangerous and not fit to be used for their intended purpose, as detailed above, Defendant engaged in one or more unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of the Oregon UTPA, including:

      a.   representing that the Product has characteristics, uses, benefits, and qualities which it does not have;

      b.   representing that the Product is of a particular standard, quality, and grade when it is not;

      c.   advertising the Product with the intent not to sell it as advertised; and

      d.   engaging in any other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce.

247.   Defendant's misrepresentations and omissions regarding the unreasonably dangerous nature of the Product was disseminated to Plaintiff Scantlin and members of the Oregon Subclass in a uniform manner.

248.   Defendant's unfair or deceptive acts or practices, including its misrepresentations, concealments, omissions, and suppressions of material facts, as alleged herein, had a tendency or capacity to mislead and create a false impression in consumers' minds, and were likely to and, in fact, did deceive reasonable consumers, including Plaintiff Scantlin and members of the Oregon Subclass, about the unreasonably dangerous nature of the Product.

249.   The facts regarding the Product that Defendant knowingly and

intentionally misrepresented, omitted, concealed, and failed to disclose would be considered material by a reasonable consumer, and they were, in fact, material to Plaintiff Scantlin and members of the Oregon Subclass, who consider such facts to be important to their purchase decisions with respect to the Product.

250.   Plaintiff Scantlin and members of the Oregon Subclass had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose. Plaintiff Scantlin and members of the Oregon Subclass did not, and could not, unravel Defendant's deception on their own.

251.   Defendant had an ongoing duty to Plaintiff Scantlin and members of the Oregon Subclass to refrain from unfair and deceptive practices under the Oregon UTPA in the course of their business. Specifically, Defendant owed Plaintiff Scantlin and members of the Oregon Subclass a duty to disclose all material facts regarding the Product, including that such products were unreasonably dangerous and not fit to be used for their intended purpose. Defendant possessed exclusive knowledge of such facts but intentionally concealed them from Plaintiff Scantlin and members of the Oregon Subclass, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

252.   Plaintiff Scantlin and members of the Oregon Subclass suffered injury in fact and lost money as a result of Defendant's conduct. Defendant falsely and misleadingly represented that the Product was healthy and safe for consumers, while omitting to disclose that they contained the carcinogen benzene. The presence of benzene rendered the Product unsafe, adulterated, and misbranded. Had Plaintiff Scantlin and members of the Oregon Subclass known the truth about the Product, they would not have purchased the Product.

253.   Defendant's violations present a continuing risk to Plaintiff Scantlin and members of the Oregon Subclass, as well as to the general public. Defendant's

unlawful acts and practices alleged herein affect the public interest.

254.   Plaintiff Scanlin, prior to filing this Complaint, served Defendant's representative with a demand letter that complies with the requirements of the WCPA.  Defendant has previously received similar demand letters, and has failed and refused to take any appropriate action in response thereto.

255.   As a result of Defendant's violations of the Oregon UTPA, as alleged herein, Plaintiff Scantlin and members of the Oregon Subclass seek an order enjoining Defendant's unfair or deceptive acts or practices and awarding actual damages, costs, attorneys' fees, and any other just and proper relief available under the Oregon UTPA.

## COUNT XVII

### VIOLATION OF PENNSYLVANIA'S UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, *et seq.*

256.   Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

257.   Plaintiff Sophocles brings this count on behalf of himself and members of the Pennsylvania Subclass.

258.   The general purpose of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-1, *et seq.* ("UTPCPL"), is to protect the public from fraud and unfair or deceptive business practices.

259.   The UTPCPL declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" described in the statute.

260.   Defendant was involved in "trade" and "commerce" as defined by 73 Pa. Stat. Ann. § 201-2(3).

261.   Defendant engaged in "unfair methods of competition" and "unfair or deceptive acts or practices" by:

a. Representing that the Product manufactured and sold by Defendant has sponsorship, approval, characteristics, ingredients, uses, benefits or quantities it does not have, as described above;

b. Representing that the Product manufactured and sold by Defendant is of a particular standard, quality or grade, when in fact the product is and was worthless, adulterated and misbranded due to the presence of benzene thereby rendering the Product unfit for use;

c. Advertising the Product with the intent not to sell it as advertised because the Product was not advertised to contain the harmful impurity benzene; and

d. As described at length in Count I, above, failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made.

262.   Defendant's misrepresentations regarding the Product ingredients and omissions in failing to disclose the defect to consumers, amounted to fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

263.   The UTPCPL provides a private right of action for any person who "suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful" by the UTPCPL.  73 P.S. § 201-9.2(a).

264.   In the course of Defendant's business, it knowingly failed to disclose and actively concealed material facts and made false and misleading statements regarding the Product, as set forth herein.

265.   Plaintiff Sophocles and members of the Pennsylvania Subclass are ordinary purchasers and did not have access to the same information as Defendant, the manufacturer of the Product.  Specifically, Plaintiff Sophocles and members of the Pennsylvania Subclass did not have access to Defendant's internal memoranda, studies, testing, or records of consumer complaints related to the Product.

Defendant's internal memoranda, studies, testing, and records of consumer complaints establish that Defendant knew of the material defect with the Product before selling the same.  Plaintiff Sophocles and members of the Pennsylvania Subclass are, when it comes to drug manufacturing, unsophisticated purchasers who were at the mercy of Defendant to inform them of the known safety defect present in the Product.  As such, Defendant had a duty to disclose the defect to Plaintiff Sophocles and members of the Pennsylvania Subclass.

266.   Plaintiff Sophocles and members of the Pennsylvania Subclass relied upon Defendant's false and misleading representations and omissions.

267.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiff Sophocles and Pennsylvania Subclass members have suffered and will continue to suffer actual damages.

268.   Plaintiff Sophocles, prior to filing this Complaint, served Defendant's representative with a demand letter that complies with the requirements of the WCPA.  Defendant has previously received similar demand letters, and has failed and refused to take any appropriate action in response thereto.

269.   Plaintiff Sophocles, individually and on behalf of the other Pennsylvania Subclass members, seeks the greater of actual damages or $100, treble damages and an award of attorneys' fees pursuant to 73 P.S. § 201-9.2(a)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a)   For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Classes and Plaintiffs' attorneys as Class Counsel;

(b)   For an order declaring the Defendant's conduct violates the causes of action referenced herein;

(c)   For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable as of right.

Dated: August 6, 2021                    Respectfully Submitted,

**WHATLEY KALLAS, LLP**

By:   */s/ Alan M. Mansfield*
Alan M. Mansfield
355 So. Grand Avenue
Suite 2450
Los Angeles, CA 90071

16870 W. Bernardo Drive, Suite 400
San Diego, CA 92127
Phone: (310) 684-2504
             (858) 674-6641
Fax:    (855) 274-1888
Email: amansfield@whatleykallas.com

Thomas Mauriello (SBN 144811)
MAURIELLO LAW FIRM
1181 Puerta Del Sol #120
San Clemente, CA 92673
Phone: (949) 542-3555
Fax: (949) 606-9690

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: tomm@maurlaw.com

C. Nicholas Dorman
(Admitted Pro Hac Vice)
WHATLEY KALLAS LLP
2001 Park Place North
Suite 1000
Birmingham, AL 35203
Phone: (205) 488-1200
Fax: (800) 922-4851
Email: ndorman@whatleykallas.com

**BURSOR & FISHER, P.A.**

By:   */s/ Yeremey Krivoshey*
           Yeremey Krivoshey

L. Timothy Fisher (State Bar No. 191626)
Yeremey Krivoshey (State Bar No. 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com
           ykrivoshey@bursor.com

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DECLARATION OF VENUE

I, Alan M. Mansfield, declare as follows:

1.      I am one of the counsel for Plaintiffs in this action and make this declaration to the best of my knowledge of the facts stated herein.

2.      At all relevant times herein, Defendant VIRGIN SCENT, INC., D/B/A ARTNATURALS was and is an entity that has its headquarters and principal place of business based in Gardena, California, is registered to do business in the State of California, and is doing business in the State of California and also in this County and District.

3.      Some of the transactions that form the basis of this action occurred, and at least a portion of Defendant's obligations or liabilities arose, in this District, as sales of the products at issue were made both in and from this District, in part through the Company's websites that are likely reviewed and/or maintained in this District, and shipments of the products that are made from this District.

4.      The Complaint filed in this matter contains a cause of action for violation of Cal. Civ. Code §§ 1750, et seq., as against Defendant.

5.      Per the foregoing assertions, the CLRA cause of action in this Complaint has been properly commenced in the proper county and District for trial under the venue provisions of the CLRA.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. This declaration was signed this 6th day of August 2021 at San Diego, California.

_____

Alan M. Mansfield